Loring, J.,
delivered the opinion' of the court:
The claimant was a colored drayman in the city of Savannah, in the State of Georgia, possessed of property real and personal, azid of good credit azid reputation in business. Between ' some time in November and December 12, 1864, he purchased sixty bales of upland cotton of Messrs. Erwin & Hardee, commission merchants. The cotton was delivered to the claimant on December 12, 1864, and it was paid for in three instalments and fully paid for by December 12,1864, or a day or two. after.
After the capture of Savannah, on the 21st of December, 1864, upon an order made by the military authorities of the United States for the surrender of cotton, the claimant reported his cotton to them, and it was seized and afterwards sold by the United States, and its net proceeds, amounting to the stun of $10,020, paid into the treasury.
*330 Messrs. Erwin & Hardee, tbe vendors, resided in Savannah, and both were in the service of the Confederate government in the rebellion. Mr. Erwin was a captain in the army, and left it in 1862 on account of his bad health. Mr. Hardee was deputy collector of the port of Savannah when the city was captured.
At the time of the sale, General Sherman’s army was approaching the South Atlantic coast, and it was expected that he would debouch about Beaufort, where preparations were making against him, while property was being brought into Savannah from other places for safety.
Previous to and at the time of the sale, Messrs. Erwin & Hardee were seeking to collect their debts by getting cotton from parties owing them, and selling it for cash. And as General Sherman approached, they and other commission merchants having cotton on hand and debts outstanding, pressed the sales of their cotton for confederate money wherewith to pay their debts, for which it was a legal tender. And at this time property rapidly changed hands. The claimant was loyal; aided Hnion prisoners and persons drafted into the rebel service to escape, and never gave aid or comfort to the rebellion.
It was claimed that the sale of the cotton was colorable, that is, as the allegation is understood, a mere pretense, leaving the ownership of the cotton in the vendors, and for their sakes covering it with the name of the claimant. But we think this is not’ proved, and that on the other hand the evidence is, that at the time of the sale the parties to it did not apprehend the capture of Savannah. Mr. Erwin, the vendor, on cross-examination was asked: “ Had you heard, at the time of the sale of this cotton to this claimant, that the United States military forces, under command of General Sherman, were advancing towards Savannah? Ans. I had at the time I made that sale the general impression in Savannah, which was that he would cut across from about Marion and strike Beaufort; they were preparing at Beaufort, little thinking he would come here. Property was being run into Savannah from all quarters for safety.”
Here Mr. Erwin testifies directly as to his belief about the capture of Savannah, and the fact he testifies to, that “property was being run into Savannah from all quarters for safety,” shows the belief of the community and its neighborhood.
But apart from this, we think it is answer enough to say that the sale between the claimant and Erwin & Hardee was dona *331 fide, and made with, tbe intent and effect of changing the ownership of the cotton from them to him. Mr. Erwin’s testimony is distinct, that the cotton was delivered to the claimant, and the full price of it paid by him to them. And the confirmatory fact is shown that the obtaining Confederate money for cotton was at that time the general purpose of Erwin & Hardee, and that the latter of these partners carried eighty thousand dollars so obtained out of the city at its capture, to pay their creditors in the country. And on the other hand it is equally clear that it was desirable for the claimant to exchange his Confederate money for cotton as a safer investment.
And if the sale was dona fide between the parties to it, and each acted for a plain advantage to himself, then that motive being shown, there is no reason or room for presuming that their motive was to defraud the United States; especially as the attempt would have been futile, for the United States, by seizing the cotton and proceeding against it under the act of 17th July, 1862, to judgment, would have avoided the sale whether colorable or bona fide. And the parties to the sale knew this, if they knew of the confiscation act, and if they did not know of that, they had no motive for a colorable sale.
And if it had been expected by the parties to this sale, bona fide between themselves, that the cotton would have been seized under the act of July 17,1862, and claimed by the petitioner under the act of March 12, 1863, we think it would have been immaterial here, because the vendors and vendee were under no obligation to act for the United States, or to sacrifice to them their own business purposes, or to take care of the United States in any way. For the United States were able to take care of themselves, and had done so by the statute of July 17, 1862, which, as to them, avoided all sales of captured and condemned cotton made by rebel owners after September, 1862. And the United States, at the time of the sale of this cotton, had no lien upon it and no title to it. They might acquire a title by seizing the cotton and prosecuting it to judgment. And this was the right they had measured out for themselves; and it was the only liability to which the laws subjected the parties to the sale, and subject to this liability, of having their sales avoided in favor of the United States, they were perfectly free to trade with each other and buy and sell as their interests dictated, and whether their dealing with each other was just *332 before or after the capture of Savannah, was, we think, equally immaterial.
And so we think it is immaterial, the sale being bona fide between the parties, that the vendors were rebels; for the statute of July 17, 1862, does not forbid sales by rebels, or any business transactions between inhabitants of a rebel community. It only avoids sales, as against the United States, of cotton which has been seized and confiscated to the United States by judgment of court, and in this it follows the old law of treason, which carried the title of the government back, by relation to the act of treason, and avoided subsequent conveyances. And this is the policy of the statute of 17th July, 1862. But it is not the policy of the United States as to captured or abandoned property, like this cotton, for against that they have not proceeded to judgment under the statute of 17th July, 1862, nor sought to avoid the sales made by rebel vendors, nor to defeat the title of loyal vendees, nor to appropriate the property to thfemselves. Because it was known that of the mass of captured and abandoned property seized there was much of it which, at the time of its seizure, belonged to loyal owners, “the faithful few among the faithless found,” whose titles would be avoided by proceedings under the statute. And to prevent this the act of 12th March, 1863, was enacted, which in its purpose, character and policy, is entirely different from the act of 1862; for the statute of 1862 is a jtenal statute, and its purpose is to punish rebels by the confiscation of their property. The statute of 12th March, 1863, is (in the best use of the word) a remedial statute, and its purpose is to do justice to loyal citizens by the restoration of their property. And to effect this purpose' of the statute, and at the same time confine its bounty to the loyal citizens for whom it was made, all claimants are required to prove their own loyalty; that by the statute is material, and the loyalty of no other person is. The statute does not require the claimant to prove the loyalty of his vendor nor make that material. And this court cannot impose on the claimant’s recovery a condition which the statute does not.
Nor does the statute of June 25, 1868, alter the statute of March 12,1863. The statute of 1868 enacts that where in any suit the loyalty of a person shall be “ material,” (and that necessarily means is made material by statute,) that in such case, it shall be proved affirmatively by the party asserting it. That, *333 in this court, applies only to claimants, and as to them, had been adjudged here before it was enacted.
Where the sale is bona fide between the parties to it, it cannot be a fraud against any of the statutes cited. None is possible by the vendee against the statute of July 17, 1862, for that founds the title of the United States on the treason of the vendor, which is antecedent to the sale, and that is defeated by the statute irrespective of the vendee, and equally whether he is loyal or disloyal, honest or dishonest. And if the sale is bona fide between the parties to it, and vests the ownership of the property in the vendee, it cannot be a fraud against the statute of March 12, 1863, for that only'requires the claimant to prove a title good against third persons, that is, others than the United States, and a bona fide sale, vesting the ownership in the vendee, does exactly that; and, as has been said before, this court cannot require of the claimant any thing more than the statute does. The United States do not aslc nor authorize this court to ascertain whether the title of the claimant is good against them; for it cannot be, but only that it is such as will protect them against other claimants. And as the statute does not require bona fide vendees to sacrifice their opportunities for profit to the United States, nor to forbear advantageous purchases on the approach of their armies, and does not impute it to them as a fraud or a fault that they sought their own advantage in markets deranged by war, this court cannot do so.
It may be possible that a citizen shown to be loyal, and neither wishing cotton for any purposes of his own or to cover it for a vendor, may yet buy cotton merely to prevent its coming into the possession of the United States, but such a remote possibility has not as yet been shown in evidence here, and it is not a ground for the construction of a statute, “ ad ea qiim frequentius aecedunt, jura adaptantur.”
And on the whole case we decide as conclusions of law—
That where it is proved that a sale was bona fide between the parties to it, and made with the intent and effect of transferring the ownership for the price, it is immaterial that the vendor was a rebel, or that the capture of the property and its seizure by the United States was imminent, and known to be so by the parties of the sale.
That where the sale was colorable, and made to cover the property of the nominal vendor by the apparent ownership of *334 tbe nominal vendee, it is fraudulent and void; and tbe vendee cannot recover tbe net proceeds of tbe property in this court, for want of title in himself.
On tbe facts stated, tbe court find that tbe claimant is entitled to judgment for the net proceeds of sixty bales of upland cotton, amounting to tbe sum of $10,020.